IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NYSHIANA SHANTEZ MARTIN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-3092 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                              January 29, 2024

This case has returned to federal court after two prior remands to the

Commissioner for further consideration of evidence relating to consolidated applications

for a closed period of supplemental security income ("SSI") filed by Nyshiana Shantez

Martin ("Plaintiff").  For the reasons that follow, I conclude that the most recent

Administrative Law Judge ("ALJ") decision is supported by substantial evidence.

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed for SSI on November 18, 2011, alleging disability as a

result of bipolar disorder, depression, intermittent explosive disorder ("IED"), and

irritable bowel syndrome ("IBS").  Tr. at 81, 228, 232.[1]  Plaintiff's application was

denied initially and upon reconsideration, id. at 81-95, 96-110, and she requested a

---

[1]Plaintiff previously filed for disability insurance benefits ("DIB") on January 14, 2011, see tr. at 303-05, 2849, but she did not appeal beyond the initial determination.  Id. at 111-20, 141-45.  Plaintiff also filed a subsequent SSI application on May 20, 2016, which the Appeals Council consolidated with the November 2011 application by Order dated May 7, 2018.  Id. at 938, 1083, 1192 (application summary stating the application was filed on August 4, 2016), 1201 (correspondence stating that the correct protective filing date is May 20, 2016.  Because Plaintiff began working in May 2019, this matter involves a closed period of disability from November 18, 2011 (the relevant application date) through May 13, 2019.  Id. at 2812, 2848, 3000, 3142, 3154; see also Doc. 11 at 3.

hearing before an ALJ, id. at 132, which took place on May 21, 2014.  Id. at 44-80.  The

ALJ found on June 9, 2014, that Plaintiff was not disabled.  Id. at 24-35.  On April 1,

2016, the Appeals Council denied Plaintiff's request for review.  Id. at 1-5.

Plaintiff appealed to this court.  Martin v. Berryhill, Civ. Action No. 16-2630,

Doc. 1.  On February 28, 2018, the Honorable David R. Strawbridge issued a Report and

Recommendation ("R&R) recommending that the matter be remanded for further

consideration.  Id. Doc. 14; tr. at 1052-77.  By Order dated February 27, 2019, the

Honorable Petrese B. Tucker approved and adopted Judge Strawbridge's R&R.  Martin v.

Berryhill, Civ. Action No. 16-2630, Doc. 16; tr. at 1080.  The Appeals Council thereafter

remanded the case for further proceedings before the same ALJ.  Tr. at 1083.

On October 12, 2018, the ALJ conducted a second administrative hearing.  Tr. at

972-1009.  On November 23, 2018, the ALJ issued a new decision, again finding that

Plaintiff was not disabled.  Id. at 938-53, 2883-98.[2]  Plaintiff filed an appeal in this court

on February 15, 2019, Martin v. Saul, Civ. Action No. 19-656, Doc. 1, and by Order

dated September 10, 2019, Judge Strawbridge granted the Commissioner's uncontested

motion to remand.  Id. Doc. 18; tr. at 2909.  The Appeals Council subsequently remanded

the case for further proceedings before a different ALJ.  Tr. at 2913-15.

On November 9, 2020, the new ALJ conducted Plaintiff's third administrative

hearing.  Tr. at 2846-79.  On March 9, 2021, the second ALJ issued an opinion finding

that Plaintiff was not disabled during the closed period at issue (November 18, 2011,

---

[2]Hereafter, documents repeated in the administrative record will be cited only to
their first appearance.

through May 13, 2019).  Id. at 2806-42.  Plaintiff did not file exceptions with the Appeals Council and the Appeals Council did not otherwise assume jurisdiction, making the ALJ's March 9, 2021 decision the final decision of the Commissioner.  20 C.F.R. § 416.1484(d).

Plaintiff commenced this action in federal court on July 12, 2021, Doc. 1, and the matter is fully briefed and ripe for review.  Docs. 11, 14 & 15.[3]

## II.    LEGAL STANDARDS

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'")

---

[3]Following the first remand, the case was assigned to Judge Strawbridge upon the consent of the parties.  See Standing Order, In RE:  Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Docs. 5, 7.  Upon Judge Strawbridge's retirement, the case was reassigned to me.  Docs. 16, 18 (consent form).

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary

review of legal issues.  Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.      Whether the claimant is currently engaged in
> substantially gainful activity ("SGA");
>
> 2.      If not, whether the claimant has a "severe impairment"
> that significantly limits her physical or mental ability to
> perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the
> impairment meets or equals the criteria of an impairment
> listed in the "listing of impairments" ["Listings"], 20 C.F.R.
> pt. 404, subpt. P, app. 1, which results in a presumption of
> disability;
>
> 4.      If the impairment does not meet or equal the criteria
> for a listed impairment, whether, despite the severe
> impairment, the claimant has the residual functional capacity
> ("RFC") to perform her past work; and
>
> 5.      If the claimant cannot perform her past work, then the
> final step is to determine whether there is other work in the
> national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 416.920(a)(4).  Plaintiff bears the

burden of proof at steps one through four, while the burden shifts to the Commissioner at

the fifth step to establish that the claimant is capable of performing other jobs in the local

and national economies, in light of her age, education, work experience, and RFC.  See

Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

4

## III.   **DISCUSSION**

Plaintiff was born on May 29, 1989, making her 22 years of age at the time of her SSI application date (November 18, 2011) and 29 at the end of the closed period under review (May 13, 2019).  Tr. at 228, 2846.  She is 5 feet, 7 inches tall, and weighs approximately 240 pounds.  Id. at 232.[4]  Plaintiff lived in a house with her grandmother at the time of her application, id. at 275, 2853, and moved into an apartment with her five-year-old son in August 2020.  Id. at 2855.  She completed the twelfth grade, id. at 232-33,[5] and has no past relevant work.  Id. at 2827, 2874.[6]

### A.   **ALJ's Findings and Plaintiff's Claims**

The ALJ found that during the closed period at issue Plaintiff suffered from the severe impairments of bipolar disorder, major depressive disorder ("MDD"), IED, anxiety disorder, substance abuse disorder, and migraine headaches.  Tr. at 2812.  The ALJ found Plaintiff's obesity and IBS to be non-severe impairments, and stated that she considered both severe and non-severe impairments when assessing Plaintiff's RFC.  Id. at 2812-13.  The ALJ found that Plaintiff did not have an impairment or combination of

---

[4]Plaintiff's weight fluctuated during the lengthy closed period at issue.  See, e.g., tr. at 871 (214.5 pounds on 12/13/13), 3198 (205 pounds, 4.8 ounces on 10/8/19).

[5]Plaintiff indicated at the time of her application that she has no specialty training, tr. at 233, but testified at the November 9, 2020 hearing that she subsequently obtained a CNA (Certified Nurse Aide) certification in 2020.  Id. at 2865.

[6]Plaintiff listed several jobs in her Disability and Work History Reports for the period 2005-2010, but these appear to have been either temporary or unsuccessful.  Tr. at 233, 251; see also id. at 2852 (Plaintiff's testimony that her attempts to work were unsuccessful).  In any event, the ALJ determined that Plaintiff has no past relevant work.  Id. at 2827, 2874.

impairments that met the Listings, id. at 2813, and that she had the RFC to perform a full range of work at all exertional levels, with the following non-exertional limitations: unskilled work with simple routine tasks, simple decision making, and tolerating occasional changes in the workplace, occasional interaction with coworkers/supervisors, and no direct public interaction.  Id. at 2815-16.  Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform the representative jobs of packer at the medium and light exertional levels, and laundry worker at the medium-exertional level.  Id. at 2828.  Therefore, the ALJ found that Plaintiff was not disabled. Id. at 2828-29.

Plaintiff claims that the ALJ (1) failed to either include mental limitations in her RFC assessment that she found credible or explain why those credible limitations were omitted, (2) made legal errors in evaluating the medical opinion evidence, and (3) failed to consider Plaintiff's asthma.  Docs. 11 & 15.  Plaintiff also argues that the ALJ and Appeals Council Judges lacked the constitutional authority to adjudicate Plaintiff's application for SSI.  Id.  Defendant responds that the ALJ's opinion is supported by substantial evidence, and that the ALJ and Appeals Council Judges had the authority to adjudicate Plaintiff's application.  Doc. 14.

B.    **Medical Evidence Summary**[7]

Plaintiff's mental and physical impairments will be discussed together and chronologically.  As noted, the seven and one-half year closed period of disability at issue is November 18, 2011, through May 13, 2019.  Supra n1.

Plaintiff's record reveals multiple hospital contacts for mental health issues prior to the relevant period, beginning in 2006 at age 17.  Tr. at 388-93.  A discharge summary at that time listed her diagnoses as major depression, recurrent and severe, and asthma, mild and exercise-induced.  Id. at 388.  She also sought emergency room ("ER") treatment in September 2010 for mood swings and concerns that she would hurt herself or someone else, id. at 648, and again in January 2011 after she threatened to kill herself or her mother.  Id. at 610.  After attempting to kick and spit at staff during the latter ER visit, she was discharged into the custody of the police and charged with assault.  Id. at 610-22.  She was also admitted to Lehigh Valley Hospital in June 2011 after texting suicide statements, id. at 541, and received outpatient psychiatric care and psychotherapy at New Directions / Cedar Point Family Services ("New Directions") from February 2011 through June 2012.  Id. at 518-40, 668-80, 696-734, 893-928.

New Directions progress notes from November 2011 -- the month Plaintiff applied for SSI -- indicate that she appeared restless, spoke slowly and at a low volume, was

---

[7]Because the issues raised herein are somewhat different than those raised in Plaintiff's first appeal to this court, I will include a summary of the medical evidence for the period up to May 20, 2014, even though records from that period were discussed in Judge Strawbridge's January 26, 2018 R&R.  Civ. Action No. 16-2630, Doc. 14; tr. at 1053-70, 1077.

adequately dressed and groomed, fully oriented, and cooperative, with good eye contact, goal directed thought process/content, depressed and anxious with appropriate affect, good insight and judgment, no psychosis, and no reported mania, suicidal or homicidal ideation.  <u>Tr.</u> at 917 (11/2/2011), 919 (11/30/2011).  Mental status examinations ("MSE"s) in December 2011 and January 2012 yielded generally unremarkable results, with no restlessness or depressed or anxious affect noted.  <u>Id.</u> at 921 (12/12/2011), 923 (1/18/2012).

On January 28, 2012, Nadeem Hussain, M.D., performed a consultative physical examination which yielded minimal positive findings.  <u>Tr.</u> at 681-84.  Dr. Hussein's sole physical diagnosis was IBS, <u>id.</u> at 684, and the doctor opined that Plaintiff had no physical limitations.  <u>Id.</u> at 685-86.

On February 2, 2012, psychologist Thomas W. Lane, Ph.D., performed a psychological consultative examination.  <u>Tr.</u> at 687-89.  Dr. Lane summarized Plaintiff's history of anger and anxiety, fighting, criminal charges related to assault and disorderly conduct, school discipline, and suicide attempts, <u>id.</u> at 687-88, as well as her psychiatric history and medications, which included hydroxyzine, Celexa, and Depakote.  <u>Id.</u> at 688.[8]

---

[8]Hydroxyzine (marketed as Vistaril and Atarax) is used as a sedative to treat anxiety and tension.  <u>See</u> https://www.drugs.com/hydroxyzine.html (last visited Dec. 20, 2023).  Celexa (generic citalopram) is used to treat depression.  <u>See</u> https://www.drugs.com/celexa.html (last visited Dec. 20, 2023).  Depakote is used to treat, inter alia, manic episodes related to bipolar disorder.  <u>See</u> https://www.drugs.com/depakote.html (last visited Dec. 20, 2023).

Dr. Lane diagnosed Plaintiff with Bipolar II Disorder,[9] IED,[10] marijuana dependence

(sustained remission of six months), and alcohol abuse (with self-reported abstinence for

six months), and assigned a Global Assessment of Functioning ("GAF") score of 40-45.

Id. at 689.[11]  Dr. Lane also completed a medical source statement of ability to do work-

related activities (mental), indicating the level of Plaintiff's limitations on a five-point

scale (none, slight, moderate, marked, extreme).  Id. at 691-93.  Regarding the ability to

understand, remember, and carry out instructions, Dr. Lane opined that Plaintiff had

slight limitation in the ability to understand and remember short, simple instructions, and

_____

[9]At the time of Dr. Lane's diagnosis, the essential feature of Bipolar II Disorder was "a clinical course that is characterized by the occurrence of one or more Major Depressive Episodes . . . accompanied by at least one Hypomanic Episode . . . ." Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"), at 392.

[10]At the time of Dr. Lane's diagnosis, the essential feature of IED was episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property which were out of proportion to any provocation or precipitating psychological stressor.  DSM IV-TR at 663-64.

[11]The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  DSM IV-TR at 34.  A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  id.  A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.
The DSM-5, which replaced the DSM-IV-TR in 2013, eliminated reference to the GAF score.  However, the Commissioner continues to receive and consider GAF scores in medical evidence, see Administrative Message-13066 (July 22, 2013), and an ALJ must consider a GAF score with all of the relevant evidence in the case file.  Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa. 2016)).

moderate limitation in the abilities to carry out short, simple instructions; understand, remember and carry out detailed instructions; and make judgments on simple work-related decisions.  Id. at 692.  Regarding social limitations, Plaintiff had moderate limitations in the abilities to interact appropriately with co-workers and to respond appropriately to changes in a routine work setting, and marked limitation in the abilities to interact appropriate with the public and with supervisors, and to respond appropriately to work pressures in a usual work setting.  Id. at 692-93.  When asked to identify medical/clinical findings to support his assessments, Dr. Lane identified Plaintiff's severe problems with self-regulation secondary to Bipolar II and IED,  compounded by her history of marijuana dependence and alcohol abuse.  Id. at 693.

On April 25, 2012, at the recommendation of New Directions, Plaintiff voluntarily entered Sacred Heart Hospital with complaints of depressed mood and suicidal ideation with a plan to overdose, reporting that she had been off her medications because "they were not working" and that she engaged in occasional heavy drinking.  Tr. at 735.  She was diagnosed at admission with bipolar disorder, NOS (not otherwise specified), and assigned a GAF score of 30.  Id. at 736.[12]  Attending physician Clifford H. Schilke, M.D.,

---

[12]A GAF of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations [or] serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) [or] inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  DSM IV-TR at 34.

started Plaintiff on Geodon and Klonopin,[13] and discharged her following remission of her depression and suicidal thoughts and stabilization of her mood.  Id.

New Directions progress notes from May 2012 indicate that Plaintiff appeared inappropriately dressed and was anxious and angry, with fair eye contact, mania, and poor insight and judgment.  Tr. at 927.  Plaintiff had limited response to medication and reported drinking alcohol twice a week.  Id. at 928.  In a treatment review dated June 8, 2012, New Directions clinicians indicated that Plaintiff had partially met her treatment goals and was to continue individual therapy and medication management.  Id. at 708-09.

On August 3, 2012, a medical report from Lehigh Valley ("LV") Medical Mobile Crisis Services noted that Plaintiff had dropped out of treatment and had been without medication for two weeks after moving in with her grandmother in response to increased anger and frustration when interacting with her sister.  Tr. at 754.  Plaintiff appeared cooperative and fully oriented with stable mood, sad affect, fair concentration, goal directed thought processes, normal motor behavior, appropriate mannerisms, fair impulse control, no psychotic features, hallucinations, or delusions, and no suicidal or homicidal ideation.  Id.

On September 5, 2012, at the urging of her therapist, Plaintiff went to LV Hospital ER for evaluation and possible medication for symptoms of anxiety and depression described as "mild."  Tr. at 756.  Plaintiff again reported that she left her medications

---

[13]Geodon (generic ziprasidone) is used to treat, inter alia, the manic symptoms of bipolar disorder.  See https://www.drugs.com/geodon.html (last visited Dec. 20, 2023). Klonopin (generic clonazepam) is used to treat certain seizure disorders and panic disorder.  See https://www.drugs.com/klonopin.html (last visited Dec. 20, 2023).

behind when she moved, "[b]ut [she] had stopped them anyway due to a rash and itching." Id.   Plaintiff exhibited a flat affect with otherwise normal "Psych/Neuro" findings. Id. at 757.  She was not suicidal and had no interest in being admitted, and therefore the clinician discharged her in stable condition with a prescription for Ativan, and counseled her to resume therapy. Id. at 757-58.[14]

On December 7, 2012, in the context of the reconsideration level of review, the state agency reviewers opined that Plaintiff was capable of performing the basic mental demands of simple, routine, repetitive work in a stable environment, and that she demonstrated work capability for all exertional levels.  Tr at 108, 109.

On November 20, 2013, Plaintiff voluntarily admitted herself to LV Hospital after contacting a local crisis unit and reporting a worsening mood over the prior two months, with depression and anxiety. Tr. at 762-64.  Plaintiff stabilized with lithium[15] and was discharged on November 25, 2013, with a plan to receive treatment at the hospital's mental health clinic. Id. at 762.

On December 5, 2013, Plaintiff was transported to a hospital by ambulance for treatment of right-sided, nighttime headaches with photophobia. Tr. at 839-45.  Plaintiff reported her medications as lithium and hydroxyzine. Id. at 840.  The clinical impression

---

[14]Ativan (generic lorazepam) is used to treat insomnia caused by anxiety or temporary situational stress.  See https://www.drugs.com/ativan.html (last visited Dec. 20, 2023).

[15]Lithium is used to treat or control the manic episodes of bipolar disorder.  See https://www.drugs.com/lithium.html (last visited Dec. 20, 2023).

was migraine headache.  Id. at 845.  No new prescriptions were given and she was discharged that day in good condition.  Id.

On December 11, 2013, Plaintiff began receiving psychotherapy at LVHN Mental Health Clinic ("LVHN") with therapist Colleen C. Horlacher, LCSW.  Tr. at 846-65, 885-92, 929-31.  In the initial consultation, Ms. Horlacher noted Plaintiff's report of depressed mood, diminished interest or pleasure, weight loss, insomnia, social isolation, crying spells, irritability, decreased motivation, hopelessness, anxiety symptoms, nightmares, and hypervigilance, with anger outbursts and repetitive and impulsive behavior.  Id. at 879.  Plaintiff identified her stressors as problems with her primary support group and social environment, housing and economic problems, disruption of medical treatment due to insurance problems, and a history of trauma, interpersonal problems, and the deaths of her grandmother and ex-boyfriend.  Id.  She reported six prior suicide attempts.  Id. at 880.  MSE revealed that Plaintiff was depressed, irritable and guarded, with otherwise unremarkable findings.  Id. at 882.

On December 23, 2013, Plaintiff underwent an initial psychiatric evaluation with Susan Wiley, M.D., of LVHN.  Tr. at 871-78.  Plaintiff told Dr. Wiley that she did not like to be around people and preferred to keep to herself, that she had wanted to flee the waiting room, and that she experienced a panic attack the previous week in a similar situation.  Id. at 871-72.  Dr. Wiley performed an MSE, noting that Plaintiff avoided eye contact and exhibited psychomotor agitation and rapid speech, with memory, attention, and concentration within normal limits, "intense, hostile, constricted" affect, and "depressed, anxious, irritable, guarded" mood.  Id. at 875.  Dr. Wiley diagnosed Plaintiff

with Bipolar I – Depressed Unspecified,[16] IED, and Somatization Disorder,[17] and

assigned a GAF score of 45.  Id. at 876-77.  Dr. Wiley suspected that Plaintiff

experienced an early trauma that has not been revealed, as her symptoms "fit easily in the

diagnosis of posttraumatic stress disorder ["PTSD"]."  Id. at 877.[18]  The doctor increased

Plaintiff's lithium dosage and added Lamictal and instructed her to take her medication as

directed and to schedule a follow-up in four weeks.  Id. at 877.[19]

On December 31, 2013, LVHN physician assistant Carolyn Gaffney, PA-C ("PA

Gaffney), noted that Plaintiff did not start Lamictal due to concerns about side effects,

and that Plaintiff had discontinued lithium because of headaches, vertigo, and dizziness.

Tr. at 869.  Follow-up appointments document ongoing symptoms and medication

---

[16]The features of Bipolar I Disorder are a manic episode, "a distinct period during which there is an abnormally, persistently elevated, expansive, or irritable mood and persistently increased activity or energy that is present for most of the day, nearly every day, for a period of at least 1 week," accompanied by additional symptoms (inflated self-esteem, decreased need for sleep, more talkative, flight of ideas, distractibility, increase in goal-directed activity, or excessive involvement in activities that have a high potential for painful consequences), which may have been preceded by and may be followed by hypomanic or depressive episodes.  DSM-5 at 123, 127.

[17]Somatization Disorder typically involves multiple, current, somatic symptoms that are distressing or result in significant disruption of daily life, and which may or may not be associated with another medical condition, as well as excessive thoughts, feelings, or behaviors related to the somatic symptoms or associated health concerns.  DSM-5 at 311.

[18]PTSD is the development of characteristic symptoms following exposure to one or more traumatic events, as well as persistent avoidance of stimuli associated with the traumatic event(s).  DSM-5 at 274-75.

[19]Lamictal (generic lamotrigine) is used, inter alia, to delay mood episodes in adults with bipolar disorder.  See https://www.drugs.com/lamoictal.html (last visited Dec. 20, 2023).

adjustments.  For example, PA Gaffney prescribed Latuda in January 2014 and increased the dosage the following month.  Id. at 856-57, 866, 870.[20]  By February 17, 2014, Plaintiff had attended two therapy sessions with two cancellations, and three medication management sessions with one cancellation.  Id. at 861.  Ms. Horlacher characterized Plaintiff's compliance with treatment as good, noting that she "shows commitment for her treatment, including therapy."  Id.  On March 31, 2014, Plaintiff presented as calmer and reported "feeling a bit more in control of her reactions."  Id. at 847.  On April 24, 2014, Plaintiff noticed some improvement in her ability to communicate with her sister, resulting in less explosiveness in their interactions, and she expressed a desire to go to school and eventually work.  Id. at 890.  On May 5 and 7, 2014, Plaintiff complained about poor concentration and memory difficulties, which appeared to arise from acute stress, as well as sleep disturbances and night terrors, id. at 885, 887-88, and on May 13, 2014, she complained to Ms. Horlacher of irritability, impulsive behavior, sleep and mood disturbance, and physical and verbal outbursts.  Id. at 929.  Plaintiff acknowledged that she continued to drink alcohol and that she drank to the point of blacking out the previous week.  Id. at 930.

On May 20, 2014, Ms. Horlacher completed an assessment of Plaintiff's ability to do work-related activities (mental).  Tr. at 932-34.  With regard to the abilities needed to perform unskilled work, Ms. Horlacher opined that Plaintiff was "seriously limited" in

---

[20]Latuda (generic lurasidone) is used to treat, inter alia, episodes of depression associated with bipolar disorder.  See https://www.drugs.com/latuda.html (last visited Dec. 20, 2023).

her abilities to remember work-like procedures, make simple work-related decisions, ask simple questions or request assistance, and to be aware of normal hazards and take appropriate precautions; and was "unable to meet competitive standards" in her abilities to maintain attention for two-hour segments, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately in a routine work setting.  Id. at 932-33.[21]  Similarly, Ms. Horlacher opined that Plaintiff would be unable to meet standards for semiskilled and skilled work, including understand and remember detailed instructions, carry out detailed instructions, and set realistic goals or make plans independently of others, and had "no useful ability to function" in dealing with the stress of such work.  Id. at 933.  Ms. Horlacher explained that her assessments were based on personal observations of Plaintiff at regular individualized therapy sessions, noting that Plaintiff "[h]as not yet developed self-control of interactions when angry.  Reactive."  Id.  Ms. Horlacher further opined that Plaintiff would likely be absent from work more than four days per month due to her impairments or treatment.  Id. at 934.

Plaintiff continued with therapy and medication management at LVHN in 2014. For example, on June 19, 2014, in response to Plaintiff's report that lithium gave her headaches, Dr. Wiley started her on Lamictal and Saphris, and included Xanax on her list

_____

[21]The form defines "Seriously limited" as having "noticeable difficulty (e.g., distracted from job activity) from 11 to 20 percent of the workday or work week," and "Unable to meet most competitive standards" as having the same difficulty "from 21 to 40 percent of the workday or work week."  Tr. at 932.

of current medications.  Tr. at 1496.[22]  The doctor noted that Plaintiff "is less angry and less irritable and less resistive to care," and that lab results from May 2014 were "entirely normal."  Id.  In notes from May 2015, Ms. Horlacher did not note any missed sessions and indicated that Plaintiff had good compliance with treatment and was making some progress in therapy.  Id. at 1501, 1506-07.  On December 22, 2014, Plaintiff had stopped Lamictal due to side effects and presented with manic symptoms and complaints of depressed mood, insomnia, diminished ability to think and concentrate, and anxiety.  Id. at 1489.  Dr. Wiley noted that Plaintiff's "[m]ood is anxious but cheerful and affect is appropriate" and that she exhibited decreased attention, well-organized thought processes, logical associations, no hallucinations or delusions, intact orientation, sharp memory, good insight and judgment, and no suicidal or homicidal ideation, with a GAF score of 55.  Id. at 1490-91.[23]  Dr. Wiley added a prescription for Tegretol.  Id. at 1491.[24]

On March 6, 2015, during a routine prenatal visit while pregnant, Plaintiff reported having headaches for the past three weeks.  Tr. at 2558-60, 2562.  No behavioral and psychological symptoms were reported, and it was noted that Plaintiff treated with

---

[22]Saphris (generic asenapine) is used to treat, inter alia, bipolar I disorder, alone or in conjunction with lithium.  See https://www.drugs.com/saphris.html (last visited Dec. 20, 2023).  Xanax (generic alprazolam) is used to treat anxiety and panic disorders.  See https://www.drugs.com/xanax.html (last visited Dec. 20, 2023).

[23]A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM IV-TR at 34.

[24]Tegretol (generic carbamazepine) is used to treat, inter alia, bipolar disorder.  See https://www.drugs.com/tegretol.html (last visited Dec. 20, 2023).

Ms. Horlacher for Bipolar I disorder and was not taking any medication.  Id. at 2560 ("no meds").  Plaintiff reported that she stopped drinking alcohol and stopped smoking tobacco and marijuana when she became pregnant.  Id. at 2563.  Plaintiff denied having headaches during a subsequent prenatal visit in April 2015, id. at 2574, and during a postpartum visit in September 2015.  Id. at 2616.

On April 23, 2016, Plaintiff underwent a psychiatric evaluation following a family argument and physical altercation during which Plaintiff threatened to kill herself and family members.  Tr. at 1871-72.  Plaintiff's mother reported that Plaintiff had not been compliant with her medication.  Id. at 1871.  She was positive for suicidal ideation, agitation, and stress, and negative for hallucinations, depression, and paranoia.  Id. at 1873.  Upon examination, she appeared fully oriented and "[t]earful, mostly cooperative, slightly agitated initially."  Id.  Plaintiff left the ER against medical advice and before medical or security personnel could stop her.  Id. at 1875.

On April 27, 2016, a psychiatric intake evaluation of Plaintiff was performed as part of her entry to a partial hospitalization program at LV Hospital, on referral from PA Gaffney.  Tr. at 1825-29.  Plaintiff identified as struggling with poor concentration, helplessness/hopelessness, isolation, impulsivity, anxiety, lack of interest, irritability, low frustration tolerance, and sleep issues, and sought help to manage her anger, depression, and anxiety.  Id. at 1825.  She denied suicide attempts since 2011 or 2012, id. at 1827, and acknowledged a history of marijuana and alcohol abuse, including drinking six beers just days prior to the evaluation despite reporting that she quit marijuana and alcohol with pregnancy.  Id. at 1828, 1840.  The evaluator noted improvement in subsequent

18

evaluations and recommended that Plaintiff continue with therapy and current medications.  Id. at 1829, 1833, 1835.  She was discharged on May 13, 2016, upon completion of ten days of treatment, with improvement and partial of achievement of goals noted.  Id. at 1840-41.

On May 12, 2016, Plaintiff sought ER treatment for intermittent headaches over the past 4 weeks, with associated dizziness.  Tr. at 1919, 1921.  Her physical examination yielded normal results, including normal breath sounds and no respiratory distress, wheezes or rales, and she was noted to be fully oriented and alert, with normal mood, affect, and behavior.  Id. at 1921.  A CT scan of the brain -- described as "technically complete but compromised by motion artifact," id. at 1921 -- found no acute mass effect, hemorrhage or evidence of acute infarction.  Id. at 1922.  Plaintiff received medications including Toradol[25] and various allergy medications, and she was discharged in good condition.  Id. at 1945, 1946.

On June 27, 2016, Plaintiff returned to Dr. Wiley for the first time since February 2016.  Tr. at 2394.  Plaintiff reported interrupted sleep, irritability, depressed mood, and anxiety, but feared that an increase in medication to improve sleep and reduce irritability could cause her to sleep through her baby crying.  Id.  She reported having two drinks of alcohol per night for the past few nights.  Id. at 2396.  Dr. Wiley's MSE of Plaintiff yielded normal results except that she was sad and overwhelmed about the recent death of her grandmother.  Id. at 2397.   The doctor noted that Plaintiff had already stopped

---

[25]Toradol (generic ketorolac) is used for short-term treatment of moderate to severe pain.  See https://www.drugs.com/toradol.html (last visited Dec. 20, 2023).

lithium due to headaches, id. at 2398, and prescribed, inter alia, Saphris, alprazolam, albuterol as needed for wheezing, and medications to address complaints of seasonal allergy and acid reflux.  Id. at 2398-99.[26]  In July, Plaintiff reported that she stopped Saphris secondary to sedation; she experienced depressed mood, crying spells, and feeling stressed and overwhelmed; and was started on Vraylar.  Id. at 2402, 2403.[27]  In August, Plaintiff reported that she was "doing a lot better" on Vraylar, with no reported side effects, less depressed mood, improved appetite, and not as hopeless or as easily upset.  Id. at 2406.

On August 29, 2016, Dr. Wiley completed a medical source statement regarding Plaintiff's ability to do work-related activities (mental).  Tr. at 1964-66.[28]  Regarding abilities and aptitudes needed for unskilled work, Dr. Wiley opined that Plaintiff was "unable to meet competitive standards" in the abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and

---

[26]Albuterol is a bronchodilator used to increase air flow to the lungs in people with, inter alia, asthma.   https://www.drugs.com/albuterol.html (last visited Dec. 20, 2023).

[27]Vraylar (generic cariprazine) is used to treat mental health or mood disorders, specific types of bipolar I disorder, and as an add-on treatment for MDD.  See https://www.drugs.com/vraylar.html (last visited Dec. 20, 2023).

[28]Ms. Horlacher co-signed the form on August 29, 2016, and PA Gaffney co-signed it two days later.  Tr. at 1966.  In an accompanying letter, Ms. Horlacher stated that she, Dr. Wiley and PA Gaffney "worked collaboratively on its completion."  Id. at 1967.

deal with normal work stress; "seriously limited" in the abilities to work in coordination with or proximity to others without being unduly distracted, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in a routine work setting; and "limited but satisfactory" in all other mental abilities.  Id.  at 1964.[29]  Regarding abilities and aptitudes needed for semiskilled and skilled work, Dr. Wiley opined that Plaintiff was "unable to meet competitive standards" in the ability to deal with the stress of such work, "seriously limited" in the ability to set realistic goals or make plans independently of others, and "limited but satisfactory" in the abilities to understand, remember, and carry out detailed instructions.  Id. at 1965.  Dr. Wiley further opined that Plaintiff was "seriously limited" in her abilities to interact appropriately with the general public and to maintain socially appropriate behavior, and "limited but satisfactory" in the abilities to adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation.  Id.  The doctor explained that Plaintiff would not be able to consistently manage stress associated with sources of frustration, resulting in explosive anger and conflicts with others, and that her symptoms also affect her sleep pattern, concentration, and focus.  Id.

On September 20, 2016, Plaintiff sought treatment with her primary care provider with complaint of headaches, which started in January 2016 after she started lithium.  Tr. at 2020.  She also reported having seasonal allergies for which she takes medication only

---

[29]"Limited but satisfactory means your patient has noticeable difficulty . . . no more than 10 percent of the workday."  Tr. at 1964.  The other categories were previously defined.  Supra n.21.

when she feels congested.  Id.  A physical examination yielded normal results, including normal effort and breath sounds, and no respiratory distress.  Id. at 2021.  The provider assessed Plaintiff with migraine headaches and prescribed Topamax daily and Imitrex as needed.  Id.[30]

On September 22, 2016, Ziba Monfared, M.D., conducted a consultative physical examination.  Tr. at 1850-63.  Dr. Monfared noted that Plaintiff was diagnosed with IBS in 2009 or 2010 and has a history of asthma since childhood, that she used an inhaler only during the summer and in bad weather, and that she had not had an asthma attack requiring a hospital or clinic visit.  Id. at 1850.  The doctor also noted that Plaintiff smoked cigarettes from the age of 16 and that she used marijuana until reportedly quitting in 2013.  Id.  A physical examination yielded normal results.  Id. at 1851-52.  Dr. Monfared listed Plaintiff's diagnoses as mood disorder, asthma, and history of IBS, and assessed her prognosis as good.  Id. at 1852.  In an accompanying medical source statement of ability to do work-related activities (physical), Dr. Monfared opined that Plaintiff could lift up to 100 pounds frequently and carry up to 100 pounds occasionally; sit, stand, and walk eight hours each in an eight-hour workday; frequently operate foot controls; frequently climb stairs, ramps, ladders or scaffolds and balance, stoop, kneel, and crouch, and occasionally crawl; frequently tolerate unprotected heights, moving mechanical parts, operate a motor vehicle, and tolerate vibration; and occasionally

---

[30]Topamax (generic topiramate) is used, inter alia, to prevent migraine headaches.  See https://www.drugs.com/topamax.html (last visited Dec. 20, 2023).  Imitrex (generic sumatriptan) is also used to treat migraine headaches.  See https://www.drugs.com/imitrex.html (last visited Dec. 20, 2023).

tolerate humidity and wetness, dust, odors, fumes, irritants, extreme cold, and extreme heat.  Id. at 1854-57.  The doctor further opined that Plaintiff's physical impairments did not prevent her from performing any listed activities such as shopping, traveling, preparing simple meals, and handling paper files.  Id. at 1859.

On January 7, 2017, Plaintiff sought ER treatment for a headache after being hit on the side of the face by a television remote, tr. at 1969-2019, with symptoms of blurred vision, dizziness and nausea, negative for loss of consciousness, neck pain and stiffness, and numbness.  Id. at 1969, 1971.  Upon examination, she appeared alert and fully oriented with normal mood and affect, speech and behavior, judgment and thought content, and cognition and memory.  Id. at 1972.  A CT brain scan showed no acute intracranial hemorrhage, mass or acute vascular problem.  Id. at 1973, 1975.

On February 1, 2017, Plaintiff visited her primary care provider for a pre-employment physical for childcare.  Tr. at 2043-44.  Plaintiff reported that she "feels well with no complaints" and that her only daily medications were for her bipolar disorder, for which she "follows with psychiatry and therapy regularly."  Id. at 2043. A physical examination yielded normal results, including no respiratory distress and no wheezes or rales, and an MSE showed that Plaintiff was alert and fully oriented, with normal mood and affect.  Id. at 2044.

On April 18, 2017, on the advice of her therapist, Plaintiff went to the ER for a psychiatric evaluation after a fight with her sister prompted their mother to call the police.  Tr. at 2104, 2111.  An MSE was positive for behavioral problems and negative for suicidal or homicidal ideation and depression, although she reported passive thoughts

of suicide and admitted making multiple threats to family members.  Id. at 2106-07,
2111.  Plaintiff reported that she did not take any medication regularly – only Xanax as
needed, id. at 2109 – and that she occasionally used marijuana and alcohol, "2-3 drinks
per weekend."  Id. at 2111.  Plaintiff was hospitalized "for safety and stabilization of
symptoms," id., and adapted quickly to the inpatient setting.  Id. at 2163.  Treatment
providers initiated a multidisciplinary treatment plan of psychopharmacology and
psychotherapy, started Plaintiff on Rexulti.  Id.[31]  Plaintiff improved with resolution of
symptoms and was discharged on April 21, 2017, with a diagnosis of severe bipolar I
disorder, most recent episode depressed with anxious distress.  Id. at 2163.

Plaintiff continued to receive psychotherapy and psychiatric treatment and
medication adjustments at LVHN in 2017 through 2019.  Tr. at 2394-557, 3157-216.  On
May 15, 2017, Plaintiff told Dr. Wiley that she was unsure whether Rexulti was helping
and that she experienced headaches which could be stress related.  Tr. at 2423.  She also
told the psychiatrist that she had not been working but realized she could not change her
living arrangement until she had a job.  Id.  An MSE showed that Plaintiff's mood was
euthymic, with otherwise normal clinical findings.  Id. at 2425.  Dr. Wiley concluded that
Plaintiff was improving with Rexulti and increased her dosage.  Id. at 2426.  An MSE
performed when Plaintiff was having sutures removed on August 25, 2017, showed full
orientation and normal mood, affect, behavior, judgment, and thought content.  Id. at

---

[31]Rexulti (generic brexpiprazole) is an antipsychotic medication used in the
treatment of, inter alia, MDD.  See https://www.drugs.com/rexulti.html (last visited Dec.
20, 2023).

2355.  On September 25, 2017, Plaintiff told Dr. Wiley that she had obtained her driver's license, started a housekeeping job, and wanted to work in a correctional facility.  Id. at 2443.  She reported that her mood gets down and might last "a day or two," and that she gets more anxious when things are beyond her control.  Id.  Her MSE revealed euthymic mood and normal results, with full orientation, cooperative behavior, good eye contact, appropriate/mood congruent affect, normal speech, logical quality of thought, relevant/coherent thought content, no reported or observed perceptual disturbance, sufficient attention, intact immediate memory, and good insight, judgment, and concentration.  Id. at 2445.  Dr. Wiley did not change Plaintiff's medications and indicated that Plaintiff would continue in counseling.  Id.

On December 1, 2017, PA Gaffney noted that Plaintiff had lost her job in October for having "an attitude," that she was missing doses of Rexulti, and that she experienced mind racing, was argumentative, and did not shower or clean her room.  Tr. at 2449-50. Plaintiff committed to taking Rexulti daily for two weeks and return for re-evaluation. Id. at 2541.  When she returned on December 16, 2017, Plaintiff reported that she took her medication as directed and felt better, kept up with daily tasks, felt less depressed and argumentative, and had a decrease in mind racing.  Id. at 2454.  On February 12, 2018, Dr. Wiley characterized Plaintiff as "doing well" on Rexulti with hydroxyzine and Xanax as needed.  Id. at 2459.  Plaintiff reported that she was working in a hotel, was trying to get a car, had completed her civil service exam, and hoped to get a job at a prison.  Id. Therefore, although Plaintiff reported psychiatric symptoms of wanting to flee and crying at times, feeling "very very low," Dr. Wiley indicated that Plaintiff "is handling conflict

much better and has [a] brighter picture of her future and greater self-confidence." Id. Upon MSE, Plaintiff exhibited a sad and anxious mood, "overwhelmed but has hope and appreciates her progress," id. at 2462, with otherwise normal results, including logical thought, normal speech, and good insight, judgment, and concentration. Id. at 2461-62. On March 14, 2018, Plaintiff reported feeling "a little better – less depressed," still irritable but less reactive, and coping okay. Id. at 2466. On April 11, 2018, she reported feeling irritable for two days and anxious and overwhelmed for the past week, noting that she was worried about her mother who was hospitalized. Id. at 2470. PA Gaffney again increased Plaintiff's dose of Rexulti. Id. at 2472.

On May 7, 2018, Dr. Wiley noted Plaintiff's report that she was "irritable, with poor sleep, anxious and overwhelmed as she is out of work" and her mother had debilitating health problems, and that she experienced "low-grade auditory hallucinations." Tr. at 2475-77. The doctor further noted that Plaintiff's impulsivity was much reduced and that Rexulti helped her anxiety. Id. at 2477, 2479. An MSE revealed entirely normal mental findings. Id. at 2479.[32] The diagnosis was bipolar affective disorder, mixed. Id. at 2475. No changes were made to Plaintiff's medication. Id. at 2479.

On September 25, 2018, Dr. Wiley stated that Plaintiff had shown "great progress" in her treatment, took her medication and benefitted from it, kept her appointments and

---

[32]Plaintiff exhibited cogwheel rigidity in her upper right extremity. Tr. at 2479. Although Dr. Wiley noted the finding as part of the MSE, cogwheel rigidity is a motion impairment and is a physical rather than mental finding.

made good use of psychotherapy, and was not using any drugs.  Tr. at 2800.  The doctor
noted that Plaintiff cried and was irritable at times, but there had been no violent
outbursts.  Id.  Dr. Wiley also noted that Plaintiff had been referred to a partial hospital
program but was unable to attend due to her need to provide childcare for her son.  Id.
Dr. Wiley opined that Plaintiff was not permanently disabled and may be able to secure
employment "in the future."  Id.

Approximately one week later, on October 2, 2018, Plaintiff entered a partial
hospitalization program for worsening symptoms of depression and anxiety and
"fleeting" suicidal ideation over the past month due to family stressors.  Id. at 3157,
3163.  Plaintiff reported that she stopped using marijuana in November 2017 but
continued to use alcohol socially.  Id. at 3164.  Plaintiff was typically engaged while in
the program but made little progress due to multiple psychosocial stressors, and absences
led to her discharge to outpatient treatment on October 18, 2018.  Id. at 3195-96.
Plaintiff did not have any suicidal or homicidal ideation at the time of her discharge.  Id.
at 3196.

On March 27, 2019 -- after Plaintiff's DIB application was denied for the second
time and shortly before the end of the closed period at issue -- a routine MSE showed that
Plaintiff was irritable but otherwise the findings were unremarkable.  Tr. at 3211.  She
reported that she formerly self-medicated with marijuana and alcohol but had not used
marijuana since "before Thanksgiving" (presumably November 2018) and had not been
drinking "in the recent past," and that she was "relatively stable for herself."  Id. at 3210.

27

Plaintiff was diagnosed with bipolar affective disorder, mixed, and IED, and she was continued on her medications of hydroxyzine, Rexulti, and Xanax.  Id. at 2313-14.

On December 4, 2020, psychologist Allison Podczerwinsky, Psy.D., conducted an evidence review and completed a medical statement of ability to perform work-related activities (mental).  Tr. at 3233-35.  Dr. Podczerwinsky opined that Plaintiff had no limitations in understanding, remembering or carrying out simple instructions and making judgments on simple work-related decisions, and none -to- mild limitations in understanding, remembering and carrying out complex instructions and making judgments on complex work-related decisions.  Id. at 3233.  The doctor further opined that Plaintiff had none -to- moderate limitations in interacting appropriately with the public, supervisors, and coworkers, and for responding appropriately to usual work situations and to changes in a routine work setting, and none -to- mild limitations in concentration and managing oneself.  Id. at 3234.  In support of her opinion, Dr. Podczerwinsky noted that Plaintiff had long-term chronic substance abuse and the limitations applied when she was under the influence of substances.  Id. at 3233, 3234.

## C.   <u>Other Evidence</u>

At the November 9, 2020 administrative hearing, Plaintiff testified that she has not worked much in her lifetime because she would sometimes get frustrated and leave "instead of . . . exploding and going off," tr. at 2852, described herself as short-tempered, and explained that she would self-isolate to avoid lashing out of people.  Id. at 2857.  She could not function when on medication, which caused dizziness, id. at 2852, 2857, and she would stop her various medications at times because of the side effects.  Id. at 2869-

70.[33]  She characterized herself as "a caregiver and nurturer" who took care of her grandmother when they lived together for about five months and then every other weekend or as much as possible for about four years until she died in 2016.  Id. at 2853-54.  She has had difficulty with supervisors while working as a home care aide, id. at 2871-72, and also worked at a daycare for several months, but was fired because she experienced a panic attack after one of the children walked out.  Id. at 2853.

Plaintiff testified that she has gotten into fights with her sister and mother, and broken items such as phones or televisions, resulting in calls to the police to have her arrested or involuntarily committed for mental health treatment.  Tr. at 2866.  She also got into altercations with other people.  Id. at 2867.  When asked about assault charges, Plaintiff explained that her mother called the hospital when Plaintiff ingested pills in an apparent suicide attempt, and that she "hit a couple doctors and nurses" when they attempted to prevent her from leaving.  Id. at 2863.

Plaintiff testified that she is the only caregiver for her five-year-old son, who has both autism and ADHD (attention deficit hyperactivity disorder), and that she keeps up with his speech and occupational therapy appointments.  Tr. at 2855-56.  She explained that her son (born in 2015) gave her "a purpose and a reason to try to push and try to do what I need to do," and that she was not taking mental health medication or seeing a therapist when she started working full-time (in 2019).  Id. at 2857, 2860.  She smokes marijuana nightly to reduce her anxiety and has unsuccessfully attempted to obtain a

---

[33]Plaintiff testified that she always had anger issues, tr. at 2871 ("it's always been a part of me"), but that medication "is doing more damage than good."  Id.

medical marijuana card.  Id. at 2858-59.  She testified that she stopped drinking alcohol, but conceded that she got "really, really drunk" a week before the hearing when her great-grandmother died, and before that she drank alcohol once or twice per month.  Id. at 2861.[34]  She agreed with her therapist's recommendation of a partial hospitalization in October 2018 and attended a couple of sessions but had to stop because her mother complained about childcare for Plaintiff's son.  Id. at 2864-65.

Plaintiff agreed that she has been working "pretty regularly" since 2019 and has felt more capable since that time compared to the period under review.  Tr. at 2867-68.  When asked to explain the difference, Plaintiff credited coping skills learned in therapy, and that "I was a little bit more focused on trying to get better. . . .  My mind wasn't clouded by the medicine.  I was able to focus and get stuff done."  Id. at 2868-69.[35]

The ALJ asked the VE to consider someone of Plaintiff's age and education, with no past relevant work, who had no exertional limitations, and who would be limited to

---

[34]Plaintiff testified that she drank alcohol every night for a couple of months after losing her daycare job in March 2017.  Tr. at 2862.

[35]Plaintiff's testimony at the November 9, 2020 hearing is largely consistent with her testimony from the previous two hearings.  For example, at the first hearing on May 21, 2014, Plaintiff testified that she could not work due to "really bad anxiety" and "really bad anger issues," which she had been unable to control, and had a history of conflicts with management in work settings, with peers and teachers in school, and with family, caregivers, and strangers.  Tr. at 48, 50, 55-58, 61-64.  She also testified that she sometimes used alcohol or marijuana to control her feelings or anger.  Id. at 54-55.  Plaintiff described similar anxiety and anger issues, and self-medication, at the October 12, 2018 hearing.  Id. at 976-79, 984-85, 988-90.
Plaintiff's testimony is also largely consistent with a third-party statement completed by Tammy Martin, Plaintiff's mother.  Tr. at 1221-28.  Ms. Martin indicated that Plaintiff had difficulty dealing with other people and controlling her IED, and had trouble with directions, completing tasks, and concentrating.  Id. at 1221, 1226.

unskilled work; jobs involving only simple, routine tasks; simple decisions; occasional

changes in the workplace; occasional interaction with coworkers and supervisors; and no

direct public interaction.  Tr. at 2874.  The VE testified that such an individual could

perform medium-exertional jobs such as a range of packing and laundry worker

positions, and light-exertional jobs such as a range of packing positions.  Id. at 2874-75.

If the hypothetical person would have frequent problems interacting with coworkers and

supervisors such that it would be disruptive to the workplace, the VE testified that it

would preclude sustaining all competitive work.  Id. at 2875.  Similarly, the VE testified

that the individual could not sustain work if they would be off-task and unproductive for

15 -to- 20 percent of the workday, missed one day of work per week on a regular basis,

had difficulty completing a normal workday, or walked away from their work station

unpredictably throughout the day.  Id. at 2875-76.[36]

> **D.**    **Consideration of Plaintiff's Claims**

>> **1.**    **ALJ's RFC Assessment**

Plaintiff first argues that the ALJ failed to include mental limitations in her RFC

assessment that she found credible, or in the alternative failed to explain why those

credible limitations were omitted. Doc. 11 at 3-8; Doc. 15 at 1-4.  Defendant counters

that the ALJ's RFC determination is free of legal error and supported by substantial

evidence.  Doc. 14 at 19-25.

---

[36]When asked to characterize the work that Plaintiff performed beginning in 2019,
the VE testified that Plaintiff's home attendant and nursing assistant jobs are semi-skilled
and medium-exertional, but heavy as performed by Plaintiff.  Tr. at 2877.

The RFC assessment is the most a claimant can do despite her limitations.  20 C.F.R. § 416.945(a)(1).  In assessing a claimant's RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, including those that are not severe.  Id. § 416.945(a)(2).  However, the ALJ is not required to include every impairment a clamant alleges.  Rutherford, 399 F.3d at 554.  Rather, the RFC "must 'accurately portray' the claimant's impairments," meaning "those that are medically established," which "in turn means . . . a claimant's *credibly established limitations*."  Id. (emphasis in original) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984), and citing Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002)); Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999).  The ALJ must include all credibly established limitations in the RFC and in the hypothetical posed to the VE.  Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)).  "In making a[n RFC] determination, the ALJ must consider all evidence before [her]."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).

Here, Plaintiff's specific argument is that the ALJ found moderate limitations in concentrating, persisting, and maintaining pace, but did not adopt any mental limitations in the RFC assessment related to this area of mental functioning.  Doc. 11 at 4-5 (citing tr. at 2815).  In arguing that this omission constitutes reversible error, Plaintiff relies on the Third Circuit's decision in Ramirez, in which the court found that a limitation to simple tasks was insufficient to account for a finding that Plaintiff "often" suffered from deficiencies in concentration, persistence, or pace.  Id. at 3-4 (citing Ramirez, 372 F.3d at

552-54).  However, this holding is no longer determinative.  In its decision in <u>Hess v.</u>

<u>Commissioner of Social Security</u>, the Third Circuit held that a limitation to "simple

tasks" is sufficient to account for moderate limitations in concentration, persistence, and

pace, if the ALJ provides a valid explanation for his or her RFC determination.  931 F.3d

198, 210 (3d Cir. 2019).  The court explained,

> <u>Ramirez</u> did not hold that there is any categorical prohibition
> against using a "simple tasks" limitation after an ALJ has
> found that a claimant "often" faces difficulties in
> "concentration, persistence, or pace."  Rather a "simple tasks"
> limitation is acceptable after such a finding, as long as the
> ALJ offers a valid explanation for it.

<u>Id.</u> at 212.   The court then determined that the ALJ had offered a "valid explanation" for

the "simple tasks" limitation.

> [T]he ALJ explained at length and with sound reasoning why
> Hess's "moderate" difficulties in "concentration, persistence,
> or pace" were not so significant that Hess was incapable of
> performing "simple tasks."  For example, coupled with her
> finding that Hess had "moderate difficulties" in
> "concentration, persistence, or pace," the ALJ explained that
> Hess's "self-reported activities of daily living, such as doing
> laundry, taking care of his personal needs, shopping, working,
> and paying bills . . . are consistent with an individual who is
> able to perform simple, routine tasks."  In the same
> discussion, the ALJ also observed that "progress notes from
> treating and examining sources generally indicate no serious
> problems in this area of functioning, reporting that [Hess]
> could perform simple calculations, was fully oriented, and
> had intact remote/recent memory."

Id. at 213-14 (record citation omitted).[37]  The court also noted that the ALJ's "meticulous analysis" of the record at step four included discussion of MSEs and reports that indicated Hess could "function effectively." Id. at 214.

Here, the ALJ provided a thorough summary of the lengthy administrative record, and her analysis comported with governing regulations and contained ample supporting explanation and record citations.  For example, the regulations require the ALJ to utilize a special technique in evaluating the severity of mental impairments at steps two and three of the sequential evaluation, assessing a claimant's ability to (1) understand, remember, or apply information, (2) interact with others, (3) concentrate, persist, or maintain pace, and (4) adapt or manage oneself.  20 C.F.R. § 416.920a(c)(3).  The ALJ utilized the special technique and provided explanations for the degrees of limitations she assigned to each area.  Tr. at 2814-15.  Specifically, regarding the ability to understand, remember, or apply information, the ALJ found no limitation, observing that Plaintiff reported no problems managing money and that all MSEs performed during the closed period were normal as to memory except for one 2012 examination in which Plaintiff exhibited difficulty with short-term memory recall.  Id. at 2814.  Regarding the ability to interact with others, the ALJ found a moderate limitation, noting Plaintiff's history of difficulties

---

[37]The court also observed that under the regulations, the ability to do simple tasks -- the ability to perform work requiring understanding, remembering, and carrying out simple instructions and making only simple work-related decisions -- relates to the ability to perform "unskilled work." Hess, 931 F.3d at 210 (citing 20 C.F.R. §§ 404.1568(a); 416.968(a)).  As a result, Hess also negates Plaintiff's argument that the ALJ's RFC determination is flawed because a restriction to "unskilled" work is a vocational finding and not a functional limitation.  See Doc. 11 at 6-7; Doc. 15 at 2.

getting along with others and evidence of issues with mood and irritability throughout the record, which improved with adherence to treatment.  <u>Id.</u> at 2815.  Regarding the ability to concentrate, persist, and maintain pace, the ALJ also found a moderate limitation, noting Plaintiff's reported inability to pay attention for more than ten minutes and record evidence demonstrating good concentration and normal or sufficient attention.  <u>Id.</u>  The ALJ also found moderate limitation in the area of adapting or managing oneself, noting Plaintiff's reported difficulty handling stress and changes in routine and her multiple psychiatric full and partial hospitalizations, and also noting her inconsistent history of treatment compliance.  <u>Id.</u>

The regulations further provide that the mental RFC assessment used at steps four and five of the sequential evaluation requires a more detailed assessment of a claimant's functional capacity by itemizing various functions contained in the four broad categories assessed at steps two and three.  20 C.F.R. § 416.9520a(d)(1)-(3).  The ALJ noted this distinction, <u>see</u> tr. at 2815, and proceeded with a lengthy narrative summary of the medical record and opinion evidence, concluding that Plaintiff retained the mental RFC to perform "simple tasks."  <u>Id.</u> at 2815-27.  Notably, the ALJ gave only some weight to the opinion of Dr. Podczerwinsky, who opined in December 2020 that Plaintiff had no -to-mild limitations in understanding, remembering, or carrying out complex instructions and making judgments on complex work-related decisions.  <u>Id.</u> at 2825.  The ALJ instead found the record to be consistent with moderate limitations independent of substance abuse in light of Plaintiff's long history of mental health impairments, improvement only when she consistently adhered to treatment, and repeated medication adjustments.  <u>Id.</u>  In

short, as in <u>Hess</u>, the ALJ provided ample explanation for why she found that Plaintiff could perform jobs involving a limitation to "simple tasks" despite having moderate limitations in concentration, persistence or pace.

Plaintiff also argues that the ALJ made the same error as the previous ALJ in accounting for Plaintiff's moderate limitation in concentration, persistence, or pace, and that the Appeals Council already found that a restriction to uninvolved instructions could not accommodate such a moderate limitation.  Doc. 11 at 7-8; Doc. 15 at 2-3.  I disagree. The prior ALJ's November 23, 2018 decision limited Plaintiff to medium work "except no involved instructions" and occasional contact with the public.  <u>Tr.</u> at 2888.  In its remand order, the Appeals Council observed that an ALJ's decision mist include whether a person can perform the work-related mental activities generally required for competitive work, and that the RFC did not include sufficient specific limitations to reflect the moderate limitations in interacting with others and concentrating, persistence or pace.  <u>Id.</u> at 2913.  In contrast, the ALJ who issued the current decision included greater detail, with more specific limitations including simple, routine tasks, making simple decisions, exposure to only occasional changes in the workplace, and having only occasional interaction with co-workers and supervisors and none with the public.  <u>Id.</u> at 2815-16.

Notably, the limitations contained in the RFC under review are largely consistent with the mental RFC findings made by medical experts in 2012 and 2020, toward both ends of the closed period at issue.  The initial review State agency psychological reviewer opined that despite Plaintiff's "episodes of problems with conflicts and aggression,

getting along with others, mostly, influenced by substance abuse," she was "capable of performing the basic mental demands of simple, routine, repetitive work in a stable environment," id. at 92, and the reviewer at the reconsideration level of review opined that Plaintiff "can maintain attention and concentration for extended periods of time for simple, routine tasks," despite the presence of unstable moods that "may moderately interfere with her ability to sustain concentration, particularly in the presence of others." Id. at 107. At the other end of the closed period, in December 2020, Dr. Podczerwinsky opined that Plaintiff had no limitations in understanding, remembering or carrying out simple instructions and making judgments on simple work-related decisions; none -to- mild limitations in understanding, remembering and carrying out complex instructions and making judgments on complex work-related decisions; none -to- moderate limitations in interacting appropriately with the public, supervisors, and coworkers, and for responding appropriately to unusual work situations and to changes in a routine work setting; and none -to- mild limitations in concentration and managing oneself, with the limitations present only when Plaintiff abused substances. Id. at 3233-34. As previously noted, the ALJ found Plaintiff to be more limited than Dr. Podczerwinsky did, explaining that the record "is consistent with moderate mental health limitations independent of her use of substances." Id. at 2826.

In sum, the ALJ addressed the deficiency identified by the Appeals Council and properly accounted for Plaintiff's moderate limitation in concentration, persistence, or pace in her RFC assessment. Accordingly, this aspect of the ALJ's opinion is supported by substantial evidence.

### 2.   ALJ's Evaluation of Medical Opinion Evidence

Plaintiff next argues that the ALJ made legal errors in evaluating the medical

opinion evidence.  Doc. 11 at 8-15; Doc. 15 at 5.  Defendant counters that the ALJ's RFC

captured all of Plaintiff's credibly established mental limitations.  Doc. 14 at 13-19.

Generally, the regulations in effect at the time of Plaintiff's application dictated

that an ALJ give medical opinions the weight she deems appropriate based on factors

such as whether the physician examined or treated the claimant, whether the opinion is

supported by medical signs and laboratory findings, and whether the opinion is consistent

with the record as a whole.  20 C.F.R. § 416.927(c).[38]  "The ALJ must consider all the

evidence and give some reason for discounting the evidence she rejects."  Plummer, 186

F.3d at 429 (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  "When a

conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject

evidence for no reason or for the wrong reason.'"  Id. (quoting Mason v. Shalala, 994

F.2d 1058, 1066 (3d Cir. 1993)).  "Generally, the more consistent a medical opinion is

with the record as a whole, the more weight we will give to that medical opinion."  20

C.F.R. § 416.927(c)(4).  A treating source's medical opinion regarding the nature and

severity of an individual's impairments is entitled to controlling weight only if it is well-

supported by medically acceptable clinical and laboratory diagnostic techniques, and not

---

[38]Effective March 27, 2017, the Social Security Administration amended the rules
regarding the evaluation of medical evidence, eliminating the assignment of weight to
any medical opinion.  See Revisions to Rules Regarding the Evaluation of Medical
Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Plaintiff's application was filed
prior to the effective date of the new regulations, the opinion-weighing paradigm and
associated Social Security Rulings ("SSR") are applicable.

inconsistent with other substantial evidence in the record.  SSR 96-2p, "Policy

Interpretation Ruling Titles II and XVI:  Giving Controlling Weight to Treating Source

Medical Opinions," 1996 WL 374188, at *1 (July 2, 1996).

At the conclusion of a lengthy narrative summary of the medical evidence, which

the ALJ characterized as "massive" with "extensive mental health treatment," tr. at 2823,

the ALJ found that "there were issues of compliance.  When [Plaintiff] adhered to

recommended treatment, she clearly and consistently improved."  Id.   The ALJ

continued:

> As for the opinion evidence, Dr. Lane opined in February
> 2012 that [Plaintiff] had slight limitations for understanding
> and remembering short, simple instructions, and moderate
> limitations for carrying out simple instructions and making
> judgments on simple work-related decisions.  [Plaintiff] had
> moderate limitations for understanding, remembering, and
> carrying out detailed instructions.  [Plaintiff] had marked
> limitations for interacting appropriately with the public and
> supervisors, and moderate limitations for interacting
> appropriately with coworkers.  [Plaintiff] had marked
> limitations for responding appropriately to work pressures in
> a usual work setting and moderate limitations for responding
> appropriately to changes in a routine work setting.
>
> The undersigned gives little weight to the opinion of Dr.
> Lane.  In support of his opinion, he repeatedly referenced
> severe behavioral dyscontrol. . . .  By history, marijuana
> dependence and alcohol abuse placed further restrictions on
> cognitive functioning. . . .
>
> Dr. Lane's opinion appears to rely heavily on [Plaintiff's]
> history before she filed an application for benefits in
> November 2011.  It is inconsistent with the longitudinal
> evidence of record when [Plaintiff] was adhering to
> prescribed treatment.  During those periods, she routinely
> presented to appointments as cooperative with adequate social
> skills and was receptive to feedback and coping strategy

suggestions.  When she lost her job at the end of 2017 because of her attitude, it was noted that she was missing doses of her medication.  When she was compliant, she was doing well and being complimented for the quality of her work.  Moreover, when she was compliant with her treatment, progress notes from 2018 show that she was benefiting from medication.  She was managing . . . the responsibility of her two-year old, her mother who was in poor health, and most of the household issues.  Her impulsivity was much reduced.  Therefore, the marked limitations are not supported when [Plaintiff] was adherent to treatment.

The State agency psychological consultants opined initially in February 2012 and on reconsideration in October 2012 that [Plaintiff] had mild restriction of activities of daily living.  She had moderate difficulties in maintaining social functioning.  She had moderate difficulties in maintaining concentration, persistence, or pace.  She had no repeated episodes of decompensation, each of extended duration.

The undersigned finds the opinions of the State agency psychological consultants are generally persuasive.  In support of, and consistent with their opinions, they referenced the findings of [Dr. Lane]. . . .  At the field office, [Plaintiff] presented in a pleasant, cooperative manner with good recall.  It was also noted on reconsideration that [Plaintiff] was admitted between April 22 and May 1, 2012 with suicidal/homicidal ideation, secondary to being kicked out of her house.  She was discharged in improved condition, but she discontinued her own medications in June 2012 and started to drink again.

Ms. Horlacher opined in May 2014 that [Plaintiff] was "unable to meet competitive standards" or had "no useful ability to function" in most areas of functioning.  Two years later, Ms. Horlacher, [Dr.] Wiley, and [PA Gaffney] completed an updated medical source statement in August 2016, which was less restrictive than the opinion Ms. Horlacher had rendered two years before.  There were no areas with no useful ability to function. . . .  In most areas, [Plaintiff] was limited but satisfactory.

The undersigned gives these opinions little weight.  In support of the May 2014 opinion, Ms. Horlacher . . . indicated that [Plaintiff's] concentration, organization, and memory were impaired by her mood disorder.  She was easily distracted by others, impulsive, easily frustrated and had [poor anger] control over reactions.  There were no findings identified in support of the August 2016 medical opinion.

The undersigned finds the opinions are not consistent with the longitudinal evidence.  [Plaintiff] had had variations of mood throughout the adjudicative period, which was largely affected by her compliance with treatment.  Two out of three hospitalizations . . . coincided with not taking medications. Her inpatient hospitalizations and participation in partial hospitalization programs always resulted in improvement and Dr. Wiley consistently noted improvement with medication. [Plaintiff] was even caring for both her young child and her ailing mother.

Two years later [in September 2018], Dr. Wiley stated that in the past, [Plaintiff's] symptoms had rendered her unable to maintain employment and that even now she might have a difficult time retaining employment.  However, [Dr. Wiley] did not consider [Plaintiff] to be permanently disabled.  The undersigned gives little weight to Dr. Wiley's opinion, which is unsupported by any explanation or medical findings. . . .

A medical interrogatory was submitted to [Dr.] Podczerwinsky [who] opined in December 2020 that [Plaintiff] had no limitations for understanding, remembering, and carrying out simple instructions and making judgments on simple work-related decisions. . . .  [Plaintiff] had no to moderate limitations for interacting appropriately with the public, supervisors, and coworkers and no to moderate limitations for responding appropriately to usual work situations and to changes in a routine work setting.  She further noted that [Plaintiff] had no to mild limitations for concentration and managing oneself.

The undersigned gives some weight to the opinion of Dr. Podczerwinsky.  In support of her opinion, she stated that [Plaintiff] had long-term chronic substance abuse and that, if [Plaintiff] was under the influence of substances, then

> limitations applied. She also noted that [Plaintiff's]
> personality traits caused up to mild limitations in interacting
> with others and managing herself.  The undersigned finds that
> the record is consistent with moderate mental health
> limitations independent of her use of substances.  [Plaintiff]
> has a longstanding history of mental health impairments.
> Although she clearly improved when she consistently adhered
> to treatment, the record shows that she repeatedly required
> adjustments to her medication.

Id. at 2823-25 (record citations omitted).  The ALJ further explained that she gave little

weight to GAF scores from the adjudicative period, which ranged from 30 to 55, because

"GAF scores lack standardization and generally represent only a 'snapshot' of the

claimant's presentation on the day of the assessment" and "cannot be used in isolation

from the rest of the evidence."  Id. at 2826.  The ALJ also gave partial weight to the

opinions of Plaintiff's mother, stating that she "incorporated [the mother's] opinion into

the RFC by limiting [Plaintiff] to unskilled work, occasional interactions with coworkers

and supervisors, and no direct public interaction."  Id.

Plaintiff first argues that the ALJ impermissibly substituted her lay opinions for

those of the medical experts, particularly because the ALJ did not adopt the RFC

limitations assessed by any of the medical experts in the case.  Doc. 11 at 8-9.  I reject the

suggestion that the RFC is flawed because it does not adopt limitations found by a

medical source.  First, it is the ALJ's exclusive duty to formulate the RFC assessment, 20

C.F.R. § 416.927(d)(1), and opinions from medical sources regarding a claimant's RFC

are given no special significance under governing regulations.  Id. § 416.927(d)(3).

Second, although the ALJ fashioned an RFC assessment that is less restrictive than the

limitations expressed by Plaintiff's treating physicians, it is more restrictive than the

assessment made by psychologist Dr. Podczerwinsky.  Third, as discussed in the previous section, the ALJ provided meaningful explanation for the limitations assessed, including ample explanation for discounting the restrictions assessed by treatment providers, based on the record as a whole.  For example, the ALJ noted that most of Plaintiff's hospitalizations followed periods of non-compliance with medication and/or episodes of self-medication with marijuana or alcohol, which is confirmed by the medical record previously summarized.  See, e.g., tr. at 756-61 (9/5/12 – ER visit and hospitalization with report that Plaintiff had left her medications behind when she moved and had stopped them anyway), 1871 (4/23/16 – psychiatric evaluation after physical altercation with family, with report by Plaintiff's mother that Plaintiff had not been compliant with her medication), 1828, 1840 (4/27/16 – partial hospitalization with acknowledgement of history of marijuana and alcohol abuse, including drinking six beers just days prior to admission), 2104, 2111 (4/18/17 – ER visit and hospitalization with report that Plaintiff did not take any medication regularly and used marijuana and alcohol), 3164 (10/2/18 – partial hospitalization with report that Plaintiff stopped using marijuana in November 2017 but continued to use alcohol).

To the extent it could be argued that Plaintiff's diagnosed mental health problems caused or contributed to her repeated failure to take her medication, the record suggests otherwise.  No treatment provider opined that to be the case, and Plaintiff herself attributed her medication lapses to side effects such as rashes and headaches, and also to leaving her medication behind when she moved.  Moreover, it is worth noting that Plaintiff's diagnoses and treatment regimen (therapy and medication) did not change

between the closed period when Plaintiff did not work, and the subsequent period when she did; rather, Plaintiff explained that having a baby gave her "a purpose and a reason to try to push and try to do what I need to do," id. at 2857, and she more effectively applied coping mechanisms learned in therapy, id. at 2868-69.

The overall picture is one of apparent maturation that led to, or coincided with, better compliance with medication and less, albeit ongoing, substance abuse.  For example, on December 1, 2017, PA Gaffney noted that Plaintiff had recently lost a job for having "an attitude" and that she was missing doses of Rexulti, and therefore the PA obtained a promise from Plaintiff to take her medication as prescribed and return in two weeks for re-evaluation.  Tr. at 2541.  When Plaintiff returned on December 16, 2017, Plaintiff reported that she took her medication as directed and felt better, kept up with daily tasks, felt less depressed and argumentative, and had a decrease in mind racing.  Id. at 2454.  The record contains numerous examples of improvement with medication compliance, despite ongoing substance abuse.  See, e.g., id. at 2459 (2/12/18 – Dr. Wiley characterized Plaintiff as "doing well" on Rexulti with hydroxyzine and Xanax as needed), 2477, 2479 (5/7/18 – Dr. Wiley noted Plaintiff's impulsivity "much reduced" and Rexulti helped her anxiety), 2858 (11/9/20 – Plaintiff's testimony that she smokes marijuana nightly to reduce anxiety), 2861 (11/9/20 – Plaintiff's testimony she got "really, really drunk" a week before the hearing and before that she drank alcohol once or twice per month).  Taken together, the ALJ did not substitute her lay opinion for the opinions of the medical experts, but instead reached conclusions based on a reading of the record as a whole.

44

Plaintiff also argues that the ALJ failed to give more weight to treating sources, Doc. 11 at 9-12, and erred when she stated that Dr. Wiley's opinions were contrary to the "longitudinal evidence." Id. at 12.  As previously noted, the ALJ stated that most of Plaintiff's MSEs yielded unremarkable, often normal, findings, and her full and partial psychiatric hospitalizations -- and the concomitant low GAF scores -- mostly followed periods of noncompliance with prescribed medication and/or episodes of self-medication with marijuana and/or alcohol.  Both observations are adequately supported by the record, and therefore it cannot be said that the ALJ discounted the opinions of the treating sources for no reason or the wrong reason.  Indeed, also as noted above, the ALJ's opinion finds support in the assessments made by the State agency reviewers at the initial and reconsideration levels of review, and in the opinion of Dr. Podczerwinsky from December 2020.  Finally, to the extent Plaintiff argues that the ALJ's reliance on mostly-normal MSEs is improper because MSEs constitute mere snap-shots in time, the lengthy record contains numerous MSEs over many years of mental health treatment, such that the snap-shots add up to an overall portrait consistent with what the ALJ presented in her narrative summary.

Plaintiff also argues that the ALJ dismissed all of the GAF ratings offered by various treatment providers.  Doc. 11 at 13-14.  The ALJ did not completely dismiss the GAF scores, but rather accorded them "little weight" because they "lack standardization and generally represent only a 'snapshot' of [Plaintiff's] presentation on the day of the assessment" and should instead be viewed together with the entire record.  Tr. at 2826.  I agree with my colleague Judge Strawbridge, who stated in response to the identical

argument raised by Plaintiff in her first appeal to this court: "We do not find this argument to present an independent basis for remand, as we consider GAF scores to be of limited utility as a measure of a claimant's RFC at a particular point in time." Id. at 1075. This is particularly true where, as here, the low GAF scores were assessed mostly around the time of Plaintiff's psychiatric hospitalizations and therefore, as previously discussed, also occurred mostly at times when Plaintiff had not been reliably taking her medication and/or was abusing substances.

Finally, Plaintiff argues that the ALJ who issued the current decision made the same errors as the court identified when remanding the prior ALJ's decision. As to the opinion of consultative examiner Dr. Lane, in the June 2014 ALJ decision remanded by this court in January 2018, the prior ALJ had assigned "restricted weight" to Dr. Lane's opinion, stating only that the doctor "appeared to have relied too heavily on the claimant's subjective assertions regarding her [IED] to the detriment of the clinical findings of record." Tr. at 33. In contrast, here the ALJ thoroughly explained why she gave little weight to Dr. Lane's assessment, noting not only that the doctor appeared to heavily rely on Plaintiff's history from before November 2011, noting that the doctor's assessment was inconsistent with the longitudinal record when Plaintiff was adhering to prescribed treatment. Id. at 2823-24. The ALJ identified particular exhibits showing that Plaintiff presented at appointments as cooperative and exhibited adequate social skills, with reduced impulsivity, when compliant with treatment, and that she was managing the responsibility of care for her two-year-old child and ailing mother. Id. at 2824. As to Ms. Horlacher, the prior ALJ discounted her opinion solely because she "has treated

[Plaintiff] for a limited time" and "the degree of restriction reflected in the assessment is inconsistent with the composite treatment records." Id. at 33. Here, the ALJ provided much more explanation for her conclusion that Ms. Horlacher's May 2014 opinion was entitled to little weight. Id. at 2824-25. The ALJ explained that Ms. Horlacher's opinion was more restrictive than a later opinion she submitted jointly with Dr. Wiley and PA Gaffney, that the majority of Plaintiff's psychiatric hospitalizations coincided with failure to take medications and each hospitalization resulted in improvement, that Dr. Wiley noted improvement with medication, and that Plaintiff was caring for her young son and ailing mother. Id. at 2825.

In sum, the ALJ fulfilled her responsibility to consider all of the opinion evidence along with the mental health treatment notes in crafting an RFC addressing the limitations supported by the record.

### 3.   Plaintiff's Asthma

Plaintiff next argues that remand is required because the ALJ failed to consider Plaintiff's asthma. Doc. 11 at 15-16; Doc. 15 at 6. Defendant counters that remand is not necessary to discuss Plaintiff's asthma. Doc. 14 at 25-26.

The record reveals that Plaintiff has a longstanding diagnosis of asthma, for which she uses an inhaler. See, e.g., tr. at 388 (12/16/06, diagnoses include "asthma, mild, exercise induced"), 688 (2/2/12, medical conditions include obesity, asthma and IBS), 1125-26 (5/21/14, Plaintiff's testimony that she takes medication for asthma, that anxiety may trigger it sometimes, and that a rescue inhaler helps). Although consistently listed as a physical diagnosis in the record, the ALJ did not mention asthma at any step of the five-

step sequential evaluation.  Id. at 2812-28.  Nevertheless, considering the ALJ's decision

as a whole, see Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ need not use

any particular format and decision should be read "as a whole"), I conclude that the

omission does not require remand.

     First, the evidence does not support a finding that Plaintiff's asthma is a severe

condition.  Step two is known as the "severity regulation" because it focuses on whether

the claimant is suffering from a severe impairment.  20 C.F.R. § 416.920(c).  An

impairment is not severe if it does not "significantly limit [a claimant's] physical or

mental ability to do basic work activities."  Id.  Basic work activities are "the abilities and

aptitudes necessary to do most jobs," including physical activities "such as walking,

standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," and mental

abilities such "[u]nderstanding, carrying out, and remembering simple instructions,"

"[r]esponding appropriately to supervision, co-workers and usual work situations," and

"[d]ealing with changes in a routine work setting."  20 C.F.R. § 416.922(b)(1), (5), (6).

An impairment is considered non-severe when it has a minimal effect on the individual's

ability to work, irrespective of age, education or work experience.  Bowen v. Yuckert,

482 U.S. 137, 149-51 (1987); see also 20 C.F.R. § 416.920(c); S.S.R. 96-3p, 1996 WL

374181, "Considering Allegations of Pain and Other Symptoms in Determining Whether

a Medically Determinable Impairment is Severe."  Here, Plaintiff indicated that she uses

the inhaler infrequently, that it helps, and that she has had not had any attacks requiring

hospitalization or emergency treatment.  Tr. at 1126 (5/21/14, Plaintiff's testimony that

she keeps an inhaler on her at all times and that it helps when she has an asthma issue),

1852 (9/22/16, Plaintiff has history of asthma since childhood, used an inhaler only during the summer and in bad weather, and has never had an asthma attack requiring a hospital or clinic visit).  Moreover, Plaintiff did not receive routine or sustained treatment for asthma despite being a regular smoker of cigarettes and intermittent user of marijuana.  Thus, Plaintiff fails to meet her burden of showing that asthma is a severe impairment at step two.  See Poulos, 474 F.3d 88 at 92 (plaintiffs bear burden at steps one through four); Bowen, 482 U.S. at 147 n.5 (same).

Second, assuming the ALJ's failure to consider asthma at step two constituted error, any such error was harmless.  "The step-two inquiry is a *de minimis* screening device to dispose of groundless claims."  Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003).  Here, the ALJ did not "screen out" Plaintiff's claim at step two, but rather found other severe impairments and continued through the remaining steps of the sequential evaluation.  Because the ALJ progressed beyond step two, acknowledged Dr. Monfared's opinion that Plaintiff could occasionally tolerate humidity and wetness, dust, odors, fumes, and pulmonary irritants (id. at 2827), and considered "all of the medical opinions and evidence of record" in fashioning the RFC (id.), any omission at step two would not alter the outcome of the case.  See Orr v. Comm'r of Soc. Sec., 805 F. App'x 85, 88 (3d Cir. 2020) (where claimant alleged that ALJ should have included additional severe impairments, claimant cannot overcome the fact that "because the ALJ progressed to a later step, any error at Step Two would not alter the remainder of the five-step process, much less the overall outcome.").  Although Plaintiff argues that the ALJ should have adopted the aforementioned environmental limitations made by Dr. Monfared, the

49

ALJ explained that "[t]o the extent that [the doctor] found any physical limitations, it is not consistent with the results of her examination, which were generally unremarkable." Tr. at 2827. In fact, Dr. Monfared's examination of Plaintiff revealed clear lungs and no wheezing, crackles, or rhonchi, id. at 1852, consistent with findings of other treating sources. See, e.g., id. at 1921 (5/12/16, ER examination showed normal breath sounds and no respiratory distress, wheezes or rales), 2020-21 (9/20/16, Plaintiff reported seasonal allergies for which she takes medication only when congested, and a physical examination yielded normal results, including normal effort and breath sounds, no respiratory distress), 2044 (2/1/17, physical examination showed no respiratory distress and no wheezes or rales).

In sum, as previously discussed, the ALJ's RFC assessment and hypothetical questions included the limitations that were supported by the evidence of record. See Chrupcala, 829 F.2d at 1276 ("A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise . . . it cannot be considered substantial evidence."). Here, there is insufficient evidence that Plaintiff's asthma condition was a severe impairment or that it would affect Plaintiff's RFC. Therefore, I find that the ALJ's failure to address Plaintiff's asthma does not require remand under the circumstances of this case.

### 4.    Plaintiff's Constitutional Argument

Finally, Plaintiff argues that the appointment of Andrew Saul as Commissioner of Social Security violated the separation of powers, and therefore the ALJ and Appeals Council Judges lacked the authority to adjudicate Plaintiff's application for SSI. Doc. 11

at 16-18; Doc. 15 at 7-11.  Defendant counters that Plaintiff's separation of powers

argument does not entitle her to a new hearing.  Doc. 14 at 4-13.

Defendant concedes that 42 U.S.C. § 902(a)(3) -- which limits the President's

authority to remove the presidential-appointed and Senate-confirmed Commissioner

without good cause -- violates the separation of powers, but argues that this violation

does not support setting aside an unfavorable disability determination.  Doc. 14 at 4.

Plaintiff's argument to the contrary has its genesis in Seila Law LLC v. Consumer

Financial Protection Bureau, in which the United States Supreme Court found that a

violation of the constitutional separation of powers occurs when an executive agency is

led by a single director who serves for a longer term than the president and can only be

removed for cause.  591 U.S. ___, 140 S. Ct. 2183, 2197-2207 (2020); see also id. at

2201 (applying holding to "an independent agency led by a single Director and vested

with significant executive power").  In 2021, the Supreme Court clarified the impact of

Seila Law, holding that an unconstitutional removal provision does not automatically

render void all actions taken by individuals subject to that provision:

> Although the statute unconstitutionally limited the President's
> authority to *remove* the confirmed Directors [of the Federal
> Housing Finance Agency], there was no constitutional defect
> in the statutorily prescribed method of appointment to that
> office.  As a result, there is no reason to regard any of the
> actions taken by the [agency] as void.

Collins v. Yellen, 594 U.S. ___, 141 S. Ct. 1761, 1787 (2021) (emphasis in original).

"[I]t is still possible for an unconstitutional provision to inflict compensable harm," but

the plaintiff must show that the removal restriction was the cause of the harm he suffered.

Id. at 1789.

Applying Seila Law and Collins in social security cases, the judges of this court

have concluded that claimants have failed to establish the required nexus between the

unconstitutional appointment provision and the denial of their claims.  For example, as

explained by the late Honorable Marilyn Heffley:

> [The claimant] has no standing to file a constitutional
> challenge to the separation of powers violation because she
> has not established that she sustained an injury traceable to
> the purportedly unconstitutional removal clause to which
> Commissioner Saul was subject.  Instead of merely tracing
> her injury – the denial of disability benefits – to
> Commissioner Saul's ability to delegate power to ALJs and
> the Appeals Council in general, . . . [the claimant's] burden is
> higher:  she must be able to trace that injury to the actual
> unconstitutional removal clause, which is the unlawful
> conduct in this matter.

Wicker v. Kijakazi, Civ. No. 20-4771, 2022 WL 267896, at *10 (E.D. Pa. Jan. 28, 2022)

(citing Collins, 141 S. Ct. at 1779); see also West v. Saul, Civ. No. 20-5649, 2022 WL

16781547, at *16 (E.D. Pa. Nov. 8, 2022) (collecting cases).

Plaintiff asserts that in addition to the denial of benefits, Plaintiff has been harmed

because she "did not receive the constitutionally valid adjudication process from an ALJ

[or] the constitutionally valid determination by an ALJ to which she was entitled."  Doc.

15 at 7-8.  Plaintiff further argues that whereas the ALJ adjudicated Plaintiff's application

pursuant to the delegation of authority from former Commissioner Andrew Saul, the

former Commissioner had no valid constitutional authority to delegate the matter to the

ALJ.  Id. at 8.  As explained by the Collins Court, this is insufficient to establish the

nexus between the unconstitutional appointment provision and the denial of Plaintiff's

benefits.  Therefore, I reject Plaintiff's challenge to the ALJ's decision based on <u>Seila</u>

<u>Law</u>.

## IV.   **<u>CONCLUSION</u>**

The ALJ's RFC assessment is supported by substantial evidence, the ALJ properly

considered the opinion evidence in relation to the treatment record as a whole, and the

ALJ's failure to address Plaintiff's asthma does not warrant remand.  Plaintiff's

constitutional challenge based on <u>Seila Law</u> is rejected.